UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL K. BISHOP,

                        Plaintiff,                      Case No. 14-cv-14150

v                                      Honorable Thomas L. Ludington

SPEEDWAY LLC,

                        Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION TO PRECLUDE EXPERT WITNESS AS MOOT**

      In this age discrimination case, Plaintiff Michael Bishop alleges that Defendant Speedway, LLC demoted him from his position of Store Manager in violation of Michigan's Elliot Larsen Civil Rights Act ("ELCRA"). The day after District Manager Ryan Pelletier informed Bishop that he was being demoted to the position of Customer Service Representative ("CSR"), Bishop resigned from his position with Speedway. Speedway now moves for summary judgment, arguing that Bishop has not met his burden of creating a prima facie case of age discrimination, or in the alternative, that Bishop has not met his burden of showing pretext. Because Bishop has not met his burden of showing pretext, Speedway's motion for summary judgment will be granted.

**I.**

**A.**

      Defendant Speedway is a limited liability company that manages and operates convenience stores. Compl. ¶ 2. Pursuant to Speedway's Operations Manual, Speedway is an at-

will employer, reserving the right to discharge or terminate its employees for any reason and at any time, with or without notice. Def.'s Reply to Mot. for Summ. J. Ex. 1.

Speedway's disciplinary procedures provide for three levels of disciplinary actions. First, employees may receive confidential verbal counseling following any performance problems. *Id*. "The goal of a counseling session is to improve the associate's performance." *Id*. After counseling an employee, a supervisor is required to document the counseling session in Speedway's system, but the associate receiving the verbal counseling should not sign or receive a copy of the documentation. *Id*.

Second, employees that commit significant infractions or show significant deficiencies may receive written warnings. *Id*. A supervisor giving a written warning must document the warning in Speedway's system, and then print the document for the employee to sign. *Id*. If an associate refuses to sign the form, then the supervisor must sign the form to attest that the employee reviewed the written warning. *Id*.

Third, disciplinary termination is used where an employee commits a major infraction or shows a major deficiency in his or her job performance. *Id*. Such an employee may be immediately terminated, but should be told the reason for the termination. *Id*.

**B.**

Plaintiff Michael Bishop, a resident of Bay County, Michigan, was born on July 12, 1959. Def.'s Mot. Summ. J. Ex. 1 at 8 [Hereinafter "Bishop Deposition"]. Bishop began working for Speedway as a full-time Store Manager in December of 1999. *Id*. at 10. He was originally stationed at a large Speedway location on Euclid Avenue in Bay City, Michigan, where he remained for around eight years. *Id*. at 11. Bishop worked 50 hours a week, from 5:30 AM to 3:30 PM. *Id.*

Bishop was also a participant of Speedway's Retirement Plan, which was subsequently modified in 2012. Pl. Resp. Ex B.  Pursuant to the modification, participants' pay as of December 31, 2012 was fixed for the purposes of calculating pension benefits.  Consequently, participants' pension benefits became based on the 36-month period immediately preceding December 31, 2012.

**i.**

At the Euclid Avenue Speedway location, Bishop initially reported to district manager Rodney Duford, and then to his replacement Daniel Longoria. *Id*. at 13.  While at the Euclid Avenue location, Bishop received generally favorable reviews.  Pl. Resp. to Mot. for Summ. J. Ex A.  In his Merit Appraisal for the period spanning from October 14, 2007 to October 13, 2008, Manager Longoria praised Bishop's work ethic, but noted that he had had issues adapting to change.  *Id*.

On February 10, 2008, Bishop was verbally counseled by Manager Longoria after his store failed a Quality Assurance Inspection ("QAI"). Def.'s Mot. Summ. J. Ex. 33. In his report Longoria explained the failure resulted from Bishop's failure to follow up with a co-manager who left outdated burritos on display. *Id*. Longoria stressed that Bishop understood the "importance of the Food Mentality at his store," and that no other such failures would be tolerated. *Id*.  In his deposition, Bishop testified that he did not have any reason to doubt the accuracy of the report. Bishop Deposition at 31.

As a store manager, Bishop was never guaranteed that he would be assigned to any one store.  *Id*. at 36.  In July of 2008 Manager Longoria made the decision to transfer Bishop to a Speedway location on Center Avenue in Bay City, where he remained for around seven years. *Id*. at 33.  Mr. Longoria testified that he transferred Bishop because Bishop had been having

problems at the Euclid Avenue store. Def.'s Mot. Summ. J. Ex. 4.  Mr. Longoria emphasized an incident in which numerous employees had to be fired for stealing money from the store under Bishop's watch, as well as numerous customer complaints and consistent arguing between Bishop and another employee. *Id*. at 13-17.  Bishop claims he was transferred because Manager Longoria needed to open up the larger Euclid Avenue store so that Speedway could groom a younger manager for the eventual promotion to District Manager. *Id*. at 34.  That manager ended up being then 27-year-old Manager Ryan Pelletier. *Id*.

**ii.**

At the Center Avenue location, Bishop continued to work the same shift and hours he had worked at the Euclid Avenue location. *Id*. at 11.  In Bishop's Merit Appraisal covering the time from October 14, 2008 to October 13, 2009, Manager Longoria noted that Bishop did a good job with customer service and always appeared professional. Pl. Resp. to Mot. for Summ. J. Ex C. The appraisal also noted that Mike could work on both store organization and employee training and development. *Id*. The next Merit Appraisal for the period beginning October 14, 2009 was issued by Manager Longoria, who again commended Mike on his customer service. Pl. Resp. to Mot. for Summ. J. Ex D.  The appraisal again noted that Bishop struggled with store organization and team management. *Id*.  The appraisal also explained that the store ran well when Bishop himself was working, but that Mike needed to continue working with his shift leaders to perform better. *Id*.

**iii.**

In 2010, Ryan Pelletier replaced Dan Longoria as Bishop's District Manager. Bishop Deposition at 36. The first Merit Appraisal Pelletier gave of Bishop spanned the period from October 14, 2010 to October 13, 2011. Pl. Resp. to Mot. for Summ. J. Ex E. In that appraisal,

Pelletier noted that Bishop always appeared professional and was a dedicated employee and hands-on manager. *Id*. Mr. Pelletier stated that Bishop needed to remain more positive in the area of customer service and needed to work on training and developing his team. *Id*. Mr. Pelletier also stated that Bishop should work on his strategic thinking to improve performance and ensure that his store met their monthly goals. *Id*. Bishop signed the document to acknowledge that he received the appraisal on October 26, 2011 when he and Mr. Pelletier met to discuss it. *Id*.

During that appraisal period, Mr. Pelletier also documented a number of instances in which he had to counsel Bishop about falling below company standards. The first occurred on March 10, 2011, in which Mr. Pelletier gave Bishop a written warning for insubordination. Def.'s Mot. Summ. J. Ex. 11. In the written warning, Mr. Pelletier explained that the storage garage attached to the store contained unacceptable clutter, and that a pallet left outside of the building for some time could cause a safety issue. *Id*. Pelletier further noted that the hot cart in the store was missing products and contained several expired food items, despite the fact that Bishop had been warned earlier in the week that the roller grill needed to be up to company standards. *Id*. Finally Mr. Pelletier noted that these issues had previously been addressed with Bishop, and that any further issues would result in additional discipline, "up to and including termination." *Id*. In his deposition, Bishop testified that he had never received a copy of the "written warning" until he requested his work history file after he resigned, but that he did have a vague memory of the event.  Bishop Dep. 37-38. Bishop also testified that he remembered having many conversations with Mr. Pelletier about things like the roller grill not being up to company standards. *Id*. at 40.

In a May 3, 2011 report of a verbal counseling session, Mr. Pelletier noted that the roller grill contained minimal options, and no hotdogs, and that the "bullpen," where hot products are made in advance, was completely empty as well. Def.'s Mot. Summ. J. Ex. 12. Noting that this was the third time he had addressed this issue with Bishop, Pelletier explained, "[Bishop] needs to get better at following our food program and executing up to standards and expectations. I have talked with [Bishop] about this and let him know that his lack of awareness to our food program is hurting his store sales as well as his customer service." *Id*. Bishop had no memory of the event, and testified that he had not viewed the report until requesting his work history file. Bishop Dep. 54-56.

On June 15, 2011 Mr. Pelletier verbally counseled Bishop for failing to timely complete three of his employee reviews. Def.'s Mot. Summ. J. Ex. 13. Bishop testified that he remembered being late on the employee reviews and remembered having a conversation with Mr. Pelletier about it. Bishop Dep. 57. Pelletier again verbally counseled Bishop on October 4, 2011 for failing the previous two REA inspections for having holes in product displays. Def.'s Mot. Summ. J. Ex. 14. Bishop testified that he had seen the report in his file and had no reason to doubt its accuracy. Bishop Dep. 63-65.

Additionally, during the October 14, 2010 to October 13, 2011 appraisal period Bishop received two customer complaints for rude behavior. Def.'s Mot. Summ. J. Ex. 16. Pelletier documented that he had verbally counseled Bishop regarding these complaints. Def.'s Mot. Summ. J. Ex. 17. In his deposition, Bishop testified that he had no memory of the incidents leading to the customer complaints themselves, but that he recalled speaking with Mr. Pelletier about them. Bishop Dep. At 44. He also testified that he had not received a copy of the first

customer complaint until he requested his work history file, and had never seen a copy of the second customer complaint. *Id* at 46, 48.

### iv.

The next appraisal period began on October 14, 2011. Mr. Pelletier was gone for six to nine months of that period, since he was on a special assignment concerning the opening of newly acquired Speedway locations in Indiana. Bishop Deposition at 14. During that time, Bishop reported to temporary Manager Adam McKenzie Roberts. *Id*.

Bishop continued to receive lackluster feedback during the October 14, 2011 to October 13, 2012 appraisal period. On February 21, 2012 Bishop received a customer complaint for refusing to sell a woman lottery tickets and for yelling at an employee. Def.'s Mot. Summ. J. Ex.19. Bishop testified that he did not recall the incident. Bishop Dep. at 70-71. On August 10, 2012, temporary Manager Roberts documented that he verbally counseled Bishop after the Center Avenue Speedway failed Food Quality Inspections ("FQI's") four months in a row. Def.'s Mot. Summ. J. Ex. 18. Bishop testified that he probably had a conversation with Mr. Roberts about the events. Bishop Dep. at 73. Bishop received another customer complaint on September 27, 2012 for opining that a former employee's wife "shouldn't be sticking her nose in other people's business" after the former employee asked after an absent store employee who had been ill. Def.'s Mot. Summ. J. Ex.19. Bishop testified that he knew the complainant and remembered the events leading to the complaint. Bishop Dep. at 76-77.

In Bishop's Merit Appraisal for that period, Temporary Manager Roberts stated that Bishop did not do a good job with customer interactions and that he had received a number of customer complaints. Def.'s Mot. Summ. J. Ex. 20. The appraisal noted that Bishop had passed only 2 of his last 6 FQIs and 3 of his last 6 Relentless Execution Audits ("REA"s). *Id*. The

appraisal explained that Bishop was a trustworthy and responsible manager that optimized his schedule and shift coverage, but that he needed to hold himself and his employees accountable more often. *Id*. Mr. Roberts emphasized that Bishop needed to get better at driving results in his store and that he needed to understand that "no matter what, the success and failure of the store is on him." *Id*. Bishop signed the appraisal to acknowledge that he received it, and did not have any disagreement with the content of the appraisal. Bishop Dep. At 78-79.

### v.

During the following appraisal period, on March 11, 2013, an employee filed a complaint with Speedway management alleging that on March 6, 2013, after Bishop found a safety razor knife improperly left on the counter in the store cooking station, he threw the blade near an employee. Def.'s Mot. Summ. J. Ex. 22.  The employee alleged that Bishop stated he was "sick and tired of finding these things all over the place" and then "the blade was flying in my direction and passed about six inches in front of me." *Id*.  The employee further alleged that Bishop said he would find out who was talking to Mr. Pelletier about the incident, and then "write up that person for every little thing and they would be fired."  *Id*.

In the form of a written warning, Mr. Pelletier documented that he and a human resources representative, Rich Farran, met with Bishop on March 12, 2013 to discuss the safety razor incident. Def.'s Mot. Summ. J. Ex. 21.  The warning explained that the type of behavior Bishop exhibited on March 6 is not tolerated by Speedway regardless of the issue. *Id*. During the meeting, Bishop admitted to throwing the safety razor and acknowledged that he did not handle the situation in the proper way. *Id*. The report noted that Mr. Pelletier would be visiting the store "a couple times a week" to follow up with Bishop and his employees. *Id.* It further stated that Bishop had been told he could not retaliate against any employee that filed a complaint against

- 8 -

him. *Id*. Finally, the report stated that Bishop would be terminated if Speedway received "[a]ny additional complaints or acts of anger that could danger or threaten our employees or customers…." *Id*.  Bishop signed the written warning on March 13, 2013. *Id*. He also testified in his deposition that the incident had taken place and that he had received the written warning. Bishop Deposition at 80-85.

On July 31, 2013, Mr. Pelletier filed a request that Bishop be transferred to a new work location. Def.'s Mot. Summ. J. Ex. 24. Consequently, Bishop was transferred from the Center Avenue location to a Speedway location on M-15 in Vassar in August of 2013. Bishop Deposition at 85-86.  Mr. Pelletier testified that he transferred Bishop because his employees no longer felt safe working with him after the box cutter incident, and that he wanted to give Bishop a change with a new team. Def.'s Mot. for Summ. J. Ex. 2 at 36.  Bishop testified that he did not know why he was transferred, and that Mr.  Pelletier had only told him that a change had to be made. *Id*. at 86-87. Bishop claimed that by transferring him, Speedway was essentially telling him he would never receive another raise because he already made too much money for the Vassar location. Bishop Dep. at 135-37.

In Bishop's appraisal for that period, Mr. Pelletier wrote that Bishop was doing okay with FQIs, but continued to struggle with REAs. Def.'s Mot. Summ. J. Ex. 25. Mr. Pelletier noted that he had trouble trusting Bishop in high-stress situations due to recent incidents, but that Bishop had done well adapting to the new store. *Id*.  Like previous appraisals, the October 14, 2012 to October 14, 2013 appraisal emphasized that Bishop needed to do a better job of training his team members, and that he needed to hold himself and others accountable when necessary. *Id*.  Bishop signed the appraisal on October 16, 2013, acknowledging that he had received it. *Id*

**vi.**

The next appraisal period would be Bishop's last.  Bishop went on medical leave for a hernia surgery in December of 2013.  Bishop Dep. at 138-41.  After his return to work, Bishop received a written warning from Mr. Pelletier on March 11, 2014 for failing again FQIs and for leaving expired products on the sales floor for customers to purchase. Def.'s Mot. Summ. J. Ex. 26.  The report admonished Bishop for not following up with the employees at his store to ensure that they were actually doing the tasks they claimed to be doing. *Id*. Bishop signed the written warning on March 17, 2014 to acknowledge that he had received it. *Id*. Bishop also testified at his deposition that he had in fact received it. Bishop Dep. 101-02.

Sometime after receiving the written warning, Bishop contacted a human resources representative, Rick Farran, to inform him that he was being harassed by Mr. Pelletier. Bishop Dep. at 87-93.  Bishop explained that Mr. Pelletier was coming to the store for hours at a time to dig for items that were out of compliance. *Id*.  Mr. Pelletier was also sending other managers to dig through the store almost every other day. *Id.*

Bishop received his final written notice ten days later on March 27, 2014. Def.'s Mot. Summ. J. Ex. 27.  On that date, Mr. Pelletier reported that he had again found numerous expired food products in Bishop's store. *Id*. The notice explained that it was Bishop's final notice on keeping expired food products on the sales floor. *Id.*  Bishop signed the written notice on March 28, 2014.

As a result of this final written noticed, Bishop was placed on a Performance Improvement plan. Def.'s Mot. Summ. J. Ex. 28.  Citing Bishop's repeated FQI failures, the plan explained that Bishop needed to focus on the continued training of his staff and improving his leadership. *Id*.  It advised that Bishop needed to "demonstrate the ability to delegate tasks to all employees and follow up to ensure work completion." *Id*. It also advised that Bishop needed to

- 10 -

set expectations for employees and maintain a positive work environment. *Id*. Finally, pursuant to the plan, Mr. Pelletier would be visiting the store periodically to ensure compliance with the plan. *Id*. Bishop refused to sign a written copy of the plan because he disputed allegations that he and his staff were falsifying company documents and he disputed an assumption that sales were down because of food quality. Bishop Dep. at 120. He did not dispute any of the other statements in the performance improvement plan. *Id*.

On April 17, 2014, after finding more expired food products on the shelf at Bishop's store, Mr. Pelletier determined that Bishop had not properly followed the Performance Improvement Plan. Def.'s Mot. Summ. J. Ex. 29. For this reason, Mr. Pelletier demoted Bishop to a Customer Service Representative ("CSR") position, effective the following day. *Id*. Bishop testified that he believed the demotion was inappropriate because his store had been improving over the last month. Bishop Dep. at 122-124. He also testified that Mr. Pelletier said he was demoting him because Bishop "seemed to be burned out" from doing the job for so long. *Id*. at 123.

That same day, April 17, 2014, Bishop informed human resources representative Jo Smead that he wanted to take the following day off work to decide whether to accept the demotion or to resign from the company. Def.'s Mot. Summ. J. Ex. 31. Bishop inquired about the effect either choice would have on his vacation pay rate. *Id*. After conferring with Ryan Pelletier, Rich Farran and Robin Opp, Mr. Smead informed Bishop that if he chose to resign the next day, his remaining vacation time would be paid out at the Store Manager rate, but that if he chose to accept the CSR position, his remaining vacation time would be paid out at the CSR rate. *Id*.

Bishop ultimately chose to resign, effective April 18, 2014. *Id*. Bishop testified that he decided to resign because accepting the demotion would result in less pay, less benefits, and lower pension, as well as the huge embarrassment of working as a CSR after 29 years of doing his job. Bishop Dep. 133. He also testified that be believed Speedway was attempting to make him quit because of his age by transferring him to smaller locations, and then replacing him with younger workers who were paid less. *Id*. At the time of his demotion and resignation, Bishop was making just under $50,000 a year. *Id*. at 161.

**vii.**

Following his resignation from Speedway, Bishop began working for Auto Zone on June 22, 2014. *Id*. at 25. Bishop also received unemployment benefits for 20 weeks. *Id*. at 144. At the time of his deposition on April 21, 2015, Bishop was a full-time store manager at Auto Zone's Saginaw location. *Id*. He testified that he was working forty hours per week at a pay rate of $11.77 per hour. *Id*. at 26. Although that amount is less than what he would have made if he had remained a store manager at Speedway, Bishop testified that he was not looking for other work because he could eventually be promoted at AutoZone after his training period. *Id*. at 145-46.

Bishop testified that he continues to struggle with anxiety from the pressures of working at Speedway, and that he has resorted to breathing exercises to control that anxiety. *Id*. at 151-152. He also attributes his high blood pressure to his experience, and he continues to take blood pressure medication. *Id*. at 153.

**II**.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

- 12 -

law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

## A.

In its relevant part, ELCRA provides that an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of … age…." M.C.L. § 37.2202(1)(a).

For claims of employment discrimination lacking direct evidence, the Michigan Supreme Court has adopted a burden shifting test.  *See Lytle v. Malady*, 579 N.W.2d 906, 914-15 (Mich. 1998).  A plaintiff claiming employment discrimination has the initial burden of establishing a prima facie case. *Id*.  To do this, he must prove by a preponderance of the evidence that (1) he was a member of the protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a younger person. *Id*. at 915-16.  If a

- 13 -

plaintiff satisfies this burden, then a presumption of discrimination arises, and the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *Id*. If the defendant satisfies this burden of production, "the presumption drops away, and the burden of proof shifts back to [the] plaintiff." *Id*. at 915. To survive summary judgment, a plaintiff must then show, "by a preponderance of admissible direct or circumstantial evidence, that there was a triable issue that the employer's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Id*.

### B.

In its motion for summary judgment, Defendant Speedway first argues that Plaintiff Bishop has not made out a prima facie case of discrimination. Def.'s Mot. for Summ. J. 16. Speedway argues that Bishop cannot show either that he was the subject of an adverse employment action or that he remained qualified for the position of store manager. *Id*. For this motion only, Defendant has conceded that Plaintiff was within the protected class because of his age and that he was replaced with someone outside of the protected class. *Id*.

### i.

Defendant Speedway first argues that Bishop was not the subject of an adverse employment action under ELCRA because he voluntarily chose to resign. This argument ignores the fact that a demotion in and of itself may be an adverse employment action in violation of ELCRA. *See, e.g. Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009) (noting that a "demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices" may constitute a materially adverse employment action); *Richards v. Detroit Free Press*, 433 N.W.2d 320, 322 ("A demotion from one job to a lesser job is a discharge from the first job, and a

- 14 -

demotion will support a wrongful discharge claim").  Speedway does not dispute that Bishop was demoted to a CSR position, and that the demotion would result in decreased pay, benefits, and job responsibilities.  *See* Def.'s Mot. for Summ. J. 17.  Accordingly, Bishop has satisfied his burden of showing that he was the subject of an adverse employment action.

### ii.

Defendant Speedway also claims that Bishop cannot make out a prima facie case of age discrimination because he did not remain qualified for the store manager position. *Id.* at 18-19. To show that he was qualified for his position at the time of the demotion, Bishop must show that he "was performing at a level which met defendant's legitimate expectations." *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921 (6th Cir. 1999). "[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Dioceses of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000):

> The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Here, Bishop disputes Speedway's allegation that he was no longer qualified for the position of store manager.  He emphasizes his 29 years of experience in the position and the positive reviews he received before Mr. Pelletier became his district manager. Pl.'s Resp. 15. Bishop also objects to any argument that the declining sales at his store were caused by a decline

in food quality, and objects to any allegation that he or his staff falsified company documents. Bishop Dep. at 120. *See also Wexler*, 317 F.3d at 575 (finding the plaintiff had satisfied his initial burden of showing he was qualified for a position by disputing the contention he was unqualified and arguing that a drop in sales was due to factors other than his performance). Bishop also claims that his store's performance had been improving in the month leading up to his demotion.  Bishop Dep. at 122-24. Construing the facts in a light most favorable to Bishop, he has met his burden of showing that he met the minimum objective criteria required for the store manager position.  Accordingly, Bishop has sufficiently made out a prima facie case of employment discrimination.

### B.

Because Bishop has satisfied his burden of establishing a prima facie case, the burden shifts to Speedway to articulate a legitimate, nondiscriminatory reason for demoting Bishop. *See Lytle*, 579 N.W.2d at 915.  Poor performance, as alleged by Speedway, is a legitimate, non-retaliatory reason for terminating an employee. *Stockman v. Oakcrest Dental Ctr.*, 480 F.3d 791, 801 (6th Cir. 2007).

### C.

Because Defendant has met its burden of articulating a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to Bishop to establish that Defendant's stated reason is mere pretext for discrimination. *Lytle*, 579 N.W.2d at 915. A plaintiff generally shows pretext by showing that the proffered reason: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *See Wexler*, 317 F.3d at 576.  As noted by the Sixth Circuit, "[t]he three-part test need not be applied rigidly. Rather, [p]retext is a commonsense inquiry: did the

employer fire the employee for the stated reason or not?" *Blizzard v. Marion Technical College*, 698 F.3d 275, 287 n.6 (6th Cir. 2012).

**i**.

Plaintiff Bishop cannot satisfy his burden under the first method of proving pretext.  In his deposition, Bishop admitted that he had numerous conversations with Mr. Pelletier about his failure to meet Defendant Speedway's food safety and quality standards at the stores he managed, and admitted that he had failed numerous FQIs and REAs.  Bishop also acknowledged the incident in which he threw a safety razor near an employee. Furthermore, although Bishop objected to two of the reasons given for his placement on a performance improvement plan, he had no objection to any of the other basis of the disciplinary action, or to the plan itself. Therefore, as a matter of law Bishop cannot argue that Speedway's proffered reason for demoting him had no basis in fact.

**ii.**

Plaintiff Bishop also has not carried his burden of proving pretext under the second method — that Speedway's proffered reason for demoting him was insufficient motivation for the employment action.  Bishop appears to argue that his poor performance was not sufficient motivation to demote him because customer complaints are common and generally do not give rise to disciplinary proceedings. *See* Pl. Resp. 23.  While that may be true, Speedway's proffered reason to terminate Bishop was not based solely on customer complaints.  Instead, Speedway's proffered reason for terminating Bishop was based on three years of declining performance that included failing FQIs and REAs, poor employee training and management, poor store organization, inappropriate responses to stressful situations, *as well as* the multiple customer complaints.  Accordingly, Bishop has not carried his burden of showing that the proffered

- 17 -

motivating factors "were jointly insufficient to justify the decision." *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 411 (Mich. Ct. App. 1997) (quoting *Dubey v. Stroh Brewery Co.,*462 N.W.2d 758 (Mich. Ct. App. 1990).

### iii.

Under the third method of proving pretext, it is Plaintiff's burden to show not only that Defendant's proffered reason did not actually motivate the adverse employment action, but that age discrimination did motivate the decision.  Throughout the case, the plaintiff bears the ultimate burden of proving that age was the "but for" reason for the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, (2009).  "[U]nfairness will not afford a plaintiff a remedy unless the unfair treatment was because of age discrimination."  *Meagher*, 565 N.W.2d at 411. "Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a discrimination claim to withstand a motion for summary judgment." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir.1992).  As stated by the Supreme Court, "[i]t is not enough to disbelieve the employer, the factfinder must believe the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 146–47 (2000).

### a.

A number of Bishop's attempts to show that age discrimination was the true motivation for his demotion are completely without merit.  First, Bishop argues that Speedway did not follow its own progressive discipline policy and that it did not provide Bishop notice of the disciplinary write-ups he received. This argument fails because Speedway did in fact follow its progressive disciplinary policy, as set forth in its operation's manual. *See* Def.'s Reply to Mot. for Summ. J. Ex. 1.  Speedway's progressive disciplinary policy specifically provides that, where

a supervisor gives an employee a confidential verbal warning, the employee should not sign or receive a copy of the disciplinary report. *Id.*  It is only when an employee receives a written warning that the employee must review and sign a written document. *Id.*

Although Bishop did not receive written notice of the verbal counseling sessions, he was in fact verbally counseled, as required by Speedway's disciplinary policy. Bishop testified that he had no reason to object to the content of most of the documented verbal counseling sessions. He also testified as to remembering numerous conversations he had with Mr. Pelletier about things like expired food products, adequate number of food products, and properly displaying food products. Bishop Dep. at 40-41.  Bishop's signature appears on all of the written warnings he received, except for the performance improvement plan, and Bishop testified that he remembered reviewing the written warnings. Bishop Dep. at 80-85, 101-02, 105.  Accordingly, Bishop's arguments that Speedway did not follow company policy in disciplining him and that Speedway did not provide him with sufficient notice of the disciplinary actions taken against him are without merit.

Bishop next argues Speedway's creation of a "paper trail" supports an inference that Speedway did not really demote him for poor performance, but for age animus. The Sixth Circuit has stated in dicta that an employee would prevail on a claim of age discrimination if the employee proved that her employer deliberately began creating a false paper trail of poor performance only after deciding to terminate her because of age. *Danielson v. City of Lorain*, 938 F.2d 681, 683 (6th Cir. 1991). The *Danielson* Court concluded that a directed verdict for the employer was appropriate "because a reasonable fact finder could not find that all of [the employee's] supervisors created a false paper trail for the purpose of dismissing her because of her age." *Id.* at 685.

- 19 -

Like the plaintiff in *Danielson*, Bishop has not presented sufficient evidence for a reasonable fact finder to conclude that all of Bishop's supervisors were creating a false paper trail in order to dismiss him because of his age. First, Plaintiff only disputes a fraction of the information contained in the "paper trail." He specifically admitted to leaving expired food products on the floor for sale, failing FQIs and REAs, and throwing a box cutter near an employee. Second, the "paper trail" demonstrating Bishop's declining performance was over three years in the making. During those three years, Bishop's supervisors had ample opportunities to dismiss Bishop, had that been their goal. Specifically, they could have dismissed him after a number of his staff members were found stealing from the cash register at the Euclid location, or after he threw a safety razor in frustration near staff members at the Center Avenue location. Third, even if Bishop could show that the "paper trail" was false, he has not presented any evidence that it was created in response to his supervisors' age animus. As explained above, "unfairness will not afford a plaintiff a remedy unless the unfair treatment was because of age discrimination." *Meagher*, 565 N.W.2d at 411. Bishop's argument that Mr. Longoria, Mr. Pelletier, and Mr. Roberts created a false paper trail for the purpose of dismissing him because of his age is therefore without merit.

Bishop also argues that Speedway has provided inconsistent explanation for why Bishop was demoted. Bishop argues that initially he was not told that he had failed his performance improvement plan, and that Mr. Pelletier told him he was being demoted because he seemed "burned out." Bishop Dep. at 125. Plaintiff claims that only in this lawsuit has Speedway claimed Bishop was demoted for failing his performance improvement plan. It is true that changing, inconsistent explanations for an adverse employment action may establish pretext. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998). However, here

- 20 -

Speedway's explanations for demoting Bishop are not inconsistent. Instead, Speedway's assertions "revolve around a single idea:" Plaintiff's consistently declining job performance. *Id*.

Finally, Bishop suggests that Speedway demoted him because they wanted to pay him lower pension benefits. This argument is also completely without merit, since Bishop's pay as of December 31, 2012 was locked in for the purpose of calculating his pension benefits. *See* Pl.'s Resp. Ex. B. Because Bishop's pension was based on the 36-month period immediately preceding December 31, 2012, any subsequent demotion would not have had no effect on his pension benefits.

In conclusion, Bishop's arguments that Speedway did not follow its own disciplinary procedures, created a false paper trail, gave inconsistent reasons for his termination, and sought to pay him lower pension benefits are unsupported by the facts.

**b.**

Bishop's only remaining evidence of age discrimination is the following: (1) Mr. Pelletier told Bishop he was being demoted because he appeared to be "burned out"; (2) Bishop was replaced by younger workers after his transfers and demotion; and (3) Mr. Longoria refused Bishop's request to transfer out of Mr. Pelletier's district.

Concerning Mr. Pelletier's statement that Bishop appeared to be "burned out", it is true that discriminatory comments may be evidence of unlawful age discrimination. There is no dispute that Mr. Pelletier, the speaker, had managerial authority over the decision to demote Bishop. Accordingly, the inquiry is whether the substance of the statement evidenced impermissible age discrimination. *Krohn v. Sedgwick James of Michigan, Inc.* 624 N.W.2d 212, 214 (Mich. Ct. App. 2001). Accordingly, under Michigan law we must consider the following factors: "(1) Were the disputed remarks isolated or part of a pattern of biased comments? (2)

- 21 -

Were the disputed remarks made close in time or remote from the challenged decision? (3) Were the disputed remarks ambiguous or clearly reflective of discriminatory bias?" *Id*.

Here, there is no evidence that the remark was part of a pattern of biased comments under the first factor. Also, under the second factor, Mr. Pelletier clearly made the remark at the time of Bishop's demotion. Accordingly, the question is whether the isolated remark that Bishop seemed burned out, made at the time of his demotion, was ambiguous or clearly reflective of discriminatory bias.

Numerous courts have concluded that a supervisor's statement that an employee was "burned out" is not in itself reflective of age discrimination. *See, e.g. Branscomb v. Group USA, Inc*, 475 Fed.Appx 134 (9th Cir. 2012) (holding that a supervisor's comment that an employee was burned out was not "overtly age-related."); *E.E.O.C. v. Maricopa County*, 220 Fed.Appx 733 (9th Cir. 2007) (holding that burn-out has a separate connotation than age, and was not direct evidence of discriminatory intent); *Pearson v. City of Manhattan*, 33 F.Supp 2d 1306 (D.C. Kan. 1999) (concluding that a supervisor's statement that employee was suffering from "burn out" could have referred to employer's state of mind and not his age, and was "certainly not direct evidence of age discrimination"); *Perry v. Prudential–Bache Sec., Inc*., 738 F.Supp. 843, 851 (D.N.J. 1989) (statements describing plaintiff as "a stupid old bastard" and "burned out and forgetful" were insufficient evidence of age discrimination, but instead spoke to the employee's mistake on an important matter), *aff'd*, 904 F.2d 696 (3d Cir.1990); *Chamberlain v. Bissell Inc*., 547 F. Supp. 1067, 1077 (W.D. Mich. 1982) ("Management may legitimately discharge an executive employee because he or she has "burned out," i.e. become complacent and lost creativity and initiative…even though the "burn out" may be directly caused by the employee's

age and length of service"). Accordingly, Mr. Pelletier's statement that Bishop appeared burned out is not in itself evidence of age discrimination.

Bishop also argues that his two involuntary transfers and the fact that he was always replaced with younger employees support his contention that age discrimination was the real reason for his demotion. In his deposition, Bishop testified that he understood he was never guaranteed to be assigned to any one store. Bishop Dep. at 36. Mr. Longoria testified that he transferred Bishop because Bishop had been having problems at the Euclid Avenue store, emphasizing an incident in which numerous employees had to be fired for stealing money from the store under Bishop's watch, as well as numerous customer complaints and consistent arguing between Bishop and another employee. Def.'s Mot. Summ. J. Ex. 4. at 13-17. Mr. Pelletier, for his part, testified that he then transferred Bishop to the Vassar store because his employees no longer felt safe working with him after the box cutter incident, and that he wanted to give Bishop a change with a new team. Def.'s Mot. for Summ. J. Ex. 2 at 36.

The only evidence Bishop presents that age animus was the true reason for his transfers is that he was replaced by younger managers. As the Michigan Court of Appeals has explained, however, "Plaintiff's replacement by a younger employee, without more, is insufficient to support a claim of age discrimination." *Barnell v. Taubman Co.,* 203 512 N.W.2d 13, 19 (Mich. Ct. App. 1993).

Finally, Bishop's argument that Mr. Longoria's refusal of his request for a transfer out of Mr. Pelletier's district is evidence of age discrimination is also insufficient. Again, Bishop has failed to provide any evidence whatsoever that Mr. Longoria's refusal to transfer him was motivated by age animus.

Ultimately, all of these arguments fail for the same reason: plaintiff has not carried his ultimate burden of proving that age was the "but for" reason for the adverse employment action. *Gross*, 557 U.S. at 176.  Consequently, a reasonable jury could not find that Speedway's proffered reason for terminating Bishop, declining performance, was pretext for age discrimination.  Defendant Speedway's motion for summary judgment will be granted, and Plaintiff Bishop's complaint will be dismissed with prejudice.

## III.

Accordingly, it is **ORDERED** that Defendant Speedway's motion for summary judgment, ECF No. 23, is **GRANTED**.

It is further **ORDERED** that Defendant Speedway's motion to preclude Plaintiff Bishop from calling Frank P. Stafford as an expert witness as trial, ECF No. 24, is **DENIED as moot**.

It is further **ORDERED** that Plaintiff Bishop's Complaint, ECF No. 1, is **DISMISSED with prejudice**. This is a final order and closes the case.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: November 16, 2015

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 16, 2015.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager